UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARK SELDOMRIDGE and ALISHA TORRES, Individually, and as the Natural Parents and Next Friend of L.S., a Minor,<br>    Plaintiffs<br><br>vs.<br><br>THE PENN STATE HERSHEY MEDICAL CENTER, *et al.,*<br>    Defendants**.** | :<br>:<br>:<br>: CIVIL NO. 13-CV-2897<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

M E M O R A N D U M

*I.    Introduction*

We are considering a motion to dismiss filed by the Lancaster County Defendants.[1] (Doc. 8). This civil rights lawsuit was filed on November 19, 2013, by Plaintiffs Mark Seldomridge and Alisha Torres, against: Penn State Hershey Medical Center ("PSHMC"), six doctors employed at PSHMC, Lancaster County, and six individuals employed at the Lancaster County Children and Youth Services Agency ("CYS"). Plaintiffs allege that their constitutional rights were violated when their two-month-old child, L.S., was removed from their care for seven months as a result of a misdiagnosis of shaken baby syndrome. On January 28, 2014, the Lancaster County

---

1. The Lancaster County Defendants are: Lancaster County, and Karen Garber, Amber Redcay, Sarah Hasselback, Susan Murray, Emily Heugel, and Robin Boyer; all of whom are employed at the Lancaster County Children and Youth Services Agency.

Defendants filed a motion to dismiss for failure to state a claim. (Doc. 8). For the reasons that follow, we will grant the motion in part, and deny it in part.

*II.        Background*

The following facts are set forth in Plaintiff's complaint and are taken as true, as they must be when considering a motion to dismiss, Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009): L.S. was born in September 2011 to Plaintiff Alisha Torres. (Doc. 1, ¶ 20). Torres was administered oxytocin during labor to augment her contractions. (Doc. 1, ¶ 20). At birth, L.S. presented with a rare complication, and Plaintiffs later learned that oxytocin should not be administered during these types of births. (Doc. 1, ¶ 23). Plaintiffs took L.S. to a pediatrician for three check-ups, and no evidence of abuse was ever noted. (Doc. 1, ¶¶ 26-28). On November 29, 2011, Plaintiffs took L.S. to the pediatrician because she was "sneezing, not eating, [and] vomiting." (Doc. 1, ¶ 29). The pediatrician diagnosed L.S. with being overfed. (Doc. 1, ¶ 29). A few days later, on December 2, Plaintiffs took L.S. to the pediatrician for her two-month-old check-up. This time, L.S. was "staring into space and less interactive." (Doc. 1, ¶ 30). Her head circumference, which had steadily measured in the 90th to 98th percentiles compared to other children her age, now measured well above the 98th percentile. (Doc. 1, ¶¶ 26, 28, 30). At the pediatrician's recommendation, Plaintiffs immediately took L.S. to the Ephrata Community Hospital, and a CT scan was performed. (Doc. 1, ¶ 32). The CT scan revealed subdural hematomas or hygromas, but no skull fractures. (Doc. 1, ¶ 32). Defendant Karen Garber, an intake case worker at

Lancaster County CYS, met with Plaintiffs and told them that if they would not agree to an "Immediate Preliminary Safety Plan," L.S. would be placed in foster care. (Doc. 1, ¶ 34). The safety plan, which designated Plaintiffs as alleged perpetrators of child abuse, provided that neither parent would have unsupervised contact with L.S. (Doc. 1, ¶ 34-35). Plaintiffs were afforded no opportunity to contest the safety plan. (Doc. 1, ¶ 36). Defendant Garber requested that Plaintiff Seldomridge submit to an interview with a police detective, but he declined. (Doc. 1, ¶ 38).

L.S. was then transferred to PSHMC, and at 9:07 p.m. on December 2, Defendant Jonas Sheehan, M.D., issued a neurosurgery report recommending an "NAI [non-accidental injury] w/u [work up]." (Doc. 1, ¶ 39). At 9:43 p.m., Defendant Dorothy Rocourt, M.D., issued a pediatric surgery report recommending a "Child Safety consult" and a skeletal survey. (Doc. 1, ¶ 41). Around 10:30 p.m., Defendant Kathryn Crowell, M.D., interviewed Plaintiffs as part of the Child Safety Team consultation, and subsequently issued a report that also recommended a skeletal survey. (Doc. 1, ¶ 43-44). On December 3, Defendant Joel Weinstein, M.D., observed retinal hemorrhages and retinoschisis in L.S.'s eyes, which he reported were "highly suggestive of repetitive shaking injury and would be extremely rare in any other setting." (Doc. 1, ¶ 51). A skeletal survey was performed on L.S., but no evidence of fractures were found. (Doc. 1,¶ 59). An MRI performed on L.S. revealed a bilateral subdural hematoma. (Doc. 1, ¶ 60). Defendant Andi Taroli, M.D., Director of the PSHMC Child Safety Team, was also

consulted. She reported that L.S.'s injuries were consistent with shaking, but that Plaintiffs had denied shaking the baby. (Doc. 1, ¶¶ 63-64).

On December 6, 2011, Defendant Mark Dias, M.D., surgically drained L.S.'s subdural fluids. (Doc. 1, ¶ 71). On December 9, Defendants Garber, Redcay, and Boyer again threatened to place L.S. in foster care if Plaintiffs would not agree to a "Placement Safety Plan." (Doc. 1, ¶ 72-73). That plan provided that Plaintiffs would have two hours of supervised contact with L.S. per day, but prohibited them from having ongoing contact with her. (Doc. 1, ¶ 72).

On December 11, 2011, L.S. presented with new areas of subdural bleeding and a depressed fontanel, which, Plaintiffs allege, confirmed that her injuries were chronic in nature and not the result of shaking. (Doc. 1, ¶ 76). On December 13, 2011, L.S. was discharged but Plaintiffs were not permitted to take her home because the safety plan was still in place. (Doc. 1, ¶¶ 78, 81).

Within 30 to 60 days of December 2, 2011, Defendants Garber, Redcay, Boyer, Hasselback, Murray, Huegel, Taroli, Crowell, Weinstein, and Dias participated in a Child Safety Team meeting concerning the abuse allegations against Plaintifffs. (Doc. 1, ¶ 84). On March 5, 2012, Plaintiffs were notified in writing that Defendants Garber and Redcay filed an administrative report listing them as perpetrators of abuse. (Doc. 1, ¶ 85). The notice contained information about how Plaintiffs could obtain administrative review of the report and request its expungement. (Doc. 1, ¶ 86). On March 21, 2012, Plaintiffs requested a hearing. (Doc. 1, ¶ 87).

Case 1:13-cv-02897-WWC   Document 22   Filed 06/04/14   Page 5 of 12

Meanwhile, the safety plan was extended on April 19, 2012, because Plaintiffs had not completed a required parenting program. (Doc. 1, ¶ 88). On July 12, 2012, L.S. was permitted to return home, subject to scheduled and unscheduled visits by Lancaster County CYS employees. (Doc. 1, ¶ 94). The safety plan was lifted entirely on September 12, 2012. (Doc.1, ¶ 96). Five months later, on January 14, 2013, the Pennsylvania Department of Public Welfare conducted a hearing to determine whether the report against Plaintiffs should be expunged. (Doc. 1, ¶ 110). After finding that a reasonable person would not have concluded that L.S.'s injuries were the result of abuse, the report was expunged. (Doc. 1, ¶¶ 113-116).

Pursuant to Pennsylvania law, doctors and other professionals who investigate and report child abuse are immune from civil suit. (Doc. 1, ¶ 106). None of the doctors that treated L.S. notified Plaintiffs that they were immune from civil liability. (Doc.1, ¶¶ 40, 42,46, 49, 53, 70).

III.     *Discussion*

*A. Standard of Review*

Rule 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." Under Rule 12(b)(6), we must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (quoting Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008)). While a complaint

5

need only contain "a short and plain statement of the claim," FED. R. CIV. P. 8(a)(2), and detailed factual allegations are not required, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964, 167 L.Ed.2d. 929 (2007), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Id. at 570.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 556).   "[L]abels and conclusions" are not enough, and a court "'is not bound to accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555 (quoted case omitted).

In resolving a motion to dismiss, we thus "conduct a two-part analysis." Fowler, supra, 578 F.3d at 210.   First, we separate the factual elements from the legal elements and disregard the legal conclusions. Id. at 210-11.   Second, we "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" Id. at  211 (quoted case omitted).

*B. Procedural Due Process Claims (Counts I and III)*

Plaintiffs allege that their procedural due process rights were violated when Defendants threatened to place L.S. in foster care if Plaintiffs refused to agree to the safety plan.  (Doc. 1, ¶ 121(I)).  Because the safety plan interfered with Plaintiffs' rights to the custody and care of L.S., Plaintiffs claim that procedural safeguards were required.

6

Defendants argue that the plan was voluntary, and that Plaintiffs could have rejected the plan and elected to participate in a custody hearing.

This Court has held on two prior occasions that a parent's procedural due process rights are violated when they are coerced into signing a safety plan under the threat of losing custody of their children.  See Starkey v. York County, No. 1:11-cv-981, 2012 WL 9509712 (M.D. Pa. Dec. 20, 2012); Isbell v. Bellino, 962 F. Supp. 2d 738 (M.D. Pa. Aug. 27, 2013).  Like the plaintiff-parents in Starkey and Isbell, Plaintiffs allege they were given no instruction as to how they could challenge the safety plan, or whether they even had a right to challenge the plan.  See Starkey, 2012 WL 9509712 at *11-*12; Isbell, 962 F. Supp. 2d at 753.  Instead, they were told that if they refused to sign the agreement, L.S. would be placed in foster care.  The Third Circuit has called this type of action by county employees "blatantly coercive," and has observed that removing a child from a parent's care without providing procedural safeguards "raises a procedural due process issue."  Croft v. Westmoreland Cnty. Children & Youth Servs., 103 F.3d 1123, 1125, 1125 n.1 (3d Cir. 1997).  Accordingly, Plaintiffs have stated a plausible claim for deprivation of their procedural due process rights.  The motion to dismiss Counts I and III is denied.

### C. Failure to Train Claim

Plaintiffs allege a claim against Defendants for "failing to train its employees that, when an employee coerces a safety plan, due process considerations are triggered."  (Doc. 1, ¶ 121(I)).  In order to assert such a claim, Plaintiffs must show

deliberate indifference on the part of the municipality or its officer.  Starkey, 2012 WL 9509712 at *14.  Plaintiffs must demonstrate that:  "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice . . . ; and (3) the wrong choice by an employee will frequently cause a deprivation of constitutional rights."  Id. (internal quotation omitted) (citing Carter v. City of Phila., 181 F.3d 339, 357 (3d Cir. 1999)).  To survive a motion to dismiss, plaintiffs must identify the specific training that the municipality should have offered, and demonstrate that such training was never provided.  See Pahler v. City of Wilkes-Barre, 207 F. Supp. 2d 341, 353 (M.D. Pa 2001) (Nealon, J.).  Plaintiffs have sufficiently pleaded that information here.  The complaint alleges that Lancaster County CYS case workers, supervisors, and administrators received training through the University of Pittsburgh's Child Welfare Training Program.  (Doc. 1, ¶ 103).  That program allegedly did not provide training regarding the due process concerns that are triggered when a child is removed from its parents' care pursuant to a safety plan.  (Doc. 1, ¶ 104).  Accordingly, Plaintiffs have stated a plausible claim against Defendants for failure to train its personnel.

*D.  Conspiracy Claim (Count V)*

Plaintiffs bring a Section 1983 conspiracy claim against the individual Lancaster Defendants for "conspiring to deny Plaintiffs their right to familial association and right to the care, custody and control of L.S. . . . ."  (Doc. 1, ¶ 121(V)).  To properly state a Section 1983 conspiracy claim, Plaintiffs must show that "two or more conspirators reached an agreement to deprive him or her of a constitutional right 'under

color of law.'" Luck v. Mount Airy No. 1, LLC, 901 F. Supp. 2d 547, 559 (M.D. Pa. 2012) (Munley, J.) (citing Parkway Garage, Inc. v. City of Phila., 5 F.3d 685, 700 (3d Cir. 1993)). "A plaintiff must make specific factual allegations of combination, agreement, or understanding among all or between any of the defendants to plot, plan or conspire to carry out the alleged chain of events." Marchese v. Umstead, 110 F. Supp. 2d 361, 371 (E.D Pa. 2000).

Plaintiffs fail to state a Section 1983 conspiracy claim. The complaint is devoid of any allegations that Defendants agreed to act in concert for the purpose of depriving Plaintiffs of their constitutional right to the care, custody and control of their child. Accepting all of the pleaded facts as true, it is clear that Defendants acted for the lawful purpose of investigating a case of suspected child abuse. Although Plaintiffs contend that Pennsylvania law regarding child abuse investigations creates "a conspiracy among [Children and Youth Services], law enforcement and medical personnel[,]" this is a public policy argument that does nothing to substantiate the claim at hand. Because Plaintiffs fail to plead facts supporting a plausible claim for conspiracy, we dismiss Count V.

### *E. Frivolous Claims*

Plaintiffs allege several frivolous claims that Defendants move to dismiss. First, Plaintiffs attempt to bring a claim pursuant to Article I of the Pennsylvania Constitution. (Doc. 1, ¶ 121). Defendants correctly assert that this claim fails because Pennsylvania does not recognize actions for money damages for violations of the state

constitution. (Doc. 14 at 16). See Colvin v. Mikolic, No. 4:10-cv-1820, 2011 WL 1329188, at *6 n.3 (M.D. Pa Apr. 5, 2011) (citing R.H.S. v. Allegheny Cnty. Dept. of Human Servs., 936 A.2d 1218, 1226 (Pa Commw. Ct. 2007)). This claim will be dismissed.

      Plaintiffs allege that Defendants violated their constitutional rights by "having a policy of not notifying parents who are the subject of a child abuse investigation that physicians participating in the . . . investigation are immune from civil suit . . . ." (Doc. 1, ¶ 121(II, IV)). Defendants argue that these claims should be dismissed because they have no basis in law. We agree. The complaint fails to identify which Constitutional provision the Defendants allegedly violated, and this Court is not aware of any such constitutional right. Counts II and IV will be dismissed.

      Plaintiffs also bring a claim pursuant to 42 U.S.C. § 1981. (Doc. 1, ¶ 121). To state a claim under Section 1981, a plaintiff must allege "(1) [that plaintiff] is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute . . . ." Brown v. Phillip Morris, Inc., 250 F.3d 789, 797 (3d Cir. 2001). Plaintiffs have failed to allege any facts that might support a claim under Section 1981.

      Plaintiffs also allege that Defendants violated their First Amendment rights, but fail to specify which right was allegedly violated. (Doc. 1, ¶ 121). Because Plaintiffs make no further allegations to support this claim, it cannot stand.

The complaint also contains a Fourth Amendment claim.  While the complaint fails to provide any specifics on this claim, Plaintiffs' response to the motion to dismiss argues that the testing performed on L.S. to investigate possible abuse constituted an unreasonable search.  (Doc. 16 at 18).  According to the complaint, the Lancaster County Defendants were not involved in this investigatory testing, and therefore, the Fourth Amendment claim against these defendants must fail.

Plaintiffs' Fifth Amendment claim will also be dismissed. "The Due Process Clause of the Fifth Amendment applies to actions of the federal government, while the Due Process Clause of the Fourteenth Amendment applies to state actors." Rittenhouse Entertainment, Inc. v. City of Wilkes-Barre, 861 F. Supp. 2d 470, 486 (M.D. Pa. 2012) (Caputo, J.).  Because Plaintiffs do not allege the involvement of any federal actors, they cannot assert a claim under the Fifth Amendment.

Finally, the Sixth and Seventh Amendment claims must be dismissed. Plaintiffs were never criminally prosecuted, and thus, they could not have suffered a violation of their Sixth Amendment rights.  Similarly, Plaintiffs have alleged no facts to support the contention that their Seventh Amendment right to a jury trial has been violated.

*F.  Punitive Damages*

The Lancaster County Defendants also move to dismiss Plaintiffs' claims for punitive damages.  Defendants correctly observe that "punitive damages are not available in suits against municipalities under 42 U.S.C. § 1983." Rogers v. Mount Union

Borough by Zook, 816 F. Supp. 308, 316 (M.D. Pa.1993).  In their response to the motion to dismiss, Plaintiffs agree that punitive damages may not be appropriate.  Accordingly, the claim for punitive damages against Lancaster County is unavailing.

III.        Conclusion

For the reasons above, the motion to dismiss will be granted in part and denied in part.  Leave to amend the dismissed claims will be denied as futile.  See Grayson v. Mayview State Hosp., 293 F.3d 103 (3d Cir. 2002) (allowing courts to deny leave to amend if such an amendment would be futile).  An appropriate order follows.

/s/William W. Caldwell
William W. Caldwell
United States District Judge