UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

MARK SELDOMRIDGE and ALISHA   :
TORRES, Individually, and as the   :
Natural Parents and Next Friend of   :
L.S., a Minor,   :    CIVIL NO. 13-CV-2897
        Plaintiffs   :
  :
      vs.   :
  :
THE PENN STATE HERSHEY   :
MEDICAL CENTER, *et al.*,   :
       Defendants**.**   :

M E M O R A N D U M

*I.*      *Introduction*

       We are considering a motion to dismiss Plaintiffs' amended complaint, filed

by the Penn State Hershey Medical Center ("PSHMC") Defendants.[1]  (Doc. 30).  This

civil rights lawsuit was filed on November 19, 2013, by Plaintiffs Mark Seldomridge and

Alisha Torres, against:  Penn State Hershey Medical Center, six doctors employed at

PSHMC, Lancaster County, and six individuals employed at the Lancaster County

Children and Youth Services Agency ("CYS").  Plaintiffs allege that their constitutional

rights were violated when their two-month-old child, L.S., was removed from their care for

seven months as a result of a misdiagnosis of shaken baby syndrome.  On June 12,

2014, we granted the PSHMC Defendants' first motion to dismiss the complaint.  (Doc.

25).  Pursuant to that order, all but three of Plaintiffs' claims against the PSHMC

---

1.  The PSHMC Defendants are: the Penn State Hershey Medical Center, Kathryn Crowell, M.D.;
Andi Taroli, M.D.; Dorothy Rocourt, M.D.; Joel Weinstein, M.D.; Jonas Sheehan, M.D.; and Mark
Dias, M.D.

Defendants were dismissed with prejudice.  (Doc. 25).  The substantive due process,

First Amendment, and 42 U.S.C. § 1981 claims were dismissed without prejudice.  (Doc.

25).  On July 1, 2014, Plaintiffs filed an amended complaint.  (Doc. 28).  On July 22,

2014, the PSHMC Defendants filed their motion to dismiss the amended complaint.

(Doc. 30).

II.        *Background*

           The following facts are set forth in Plaintiffs' amended complaint and are

taken as true, as they must be when considering a motion to dismiss, Fowler v. UPMC

Shadyside, 578 F.3d 203, 210 (3d Cir. 2009):  L.S. was born in September 2011 to

Plaintiff Alisha Torres.  (Doc. 28, ¶ 20).  Torres was administered oxytocin during labor to

augment her contractions.  (Doc. 28, ¶ 20).  At birth, L.S. presented with a rare

complication, known as  "compound birth presentation."  Plaintiffs later learned that

oxytocin should not be administered during births involving this complication.  (Doc. 28, ¶

23).  Plaintiffs took L.S. to her pediatrician for three check-ups, and no evidence of abuse

was ever noted.  (Doc. 28, ¶¶ 26-28).  On November 29, 2011, Plaintiffs took L.S. to the

pediatrician because she was "sneezing, not eating, [and] vomiting."  (Doc. 28, ¶ 29).

The pediatrician diagnosed L.S. with being overfed.  (Doc. 28, ¶ 29).  A few days later,

on December 2, Plaintiffs took L.S. to the pediatrician for her two-month check-up.  This

time, L.S. was "staring into space and less interactive."  (Doc. 28, ¶ 30).  Her head

circumference, which had consistently measured in the 90th to 98th percentiles

compared to other children her age, now measured well above the 98th percentile.  (Doc.

2

28, ¶¶ 26, 28, 30).  At the pediatrician's recommendation, Plaintiffs immediately took L.S. to the Ephrata Community Hospital, and a CT scan was performed.  (Doc. 28, ¶ 32). The CT scan revealed subdural hematomas or hygromas, but no skull fractures.  (Doc. 28, ¶ 32).  Defendant Karen Garber, an intake case worker at Lancaster County CYS, met with Plaintiffs on December 2, and told them that if they would not agree to an "Immediate Preliminary Safety Plan," L.S. would be placed in foster care.  (Doc. 28, ¶ 34).  The safety plan, which designated Plaintiffs as alleged perpetrators of child abuse, provided that neither parent would have unsupervised contact with L.S.  (Doc. 28, ¶¶ 34-35).  Plaintiffs allege that they were afforded no opportunity to contest the safety plan. (Doc. 28, ¶ 36).  Defendant Garber requested that Plaintiff Seldomridge submit to an interview with a police detective, but he declined.  (Doc. 28, ¶ 38).

L.S. was then transferred to PSHMC, and at 9:07 p.m. on December 2, 2011, Defendant Jonas Sheehan, M.D., issued a neurosurgery report recommending an "NAI [non-accidental injury] w/u [work up]."  (Doc. 28, ¶ 39).  At 9:43 p.m., Defendant Dorothy Rocourt, M.D., issued a pediatric surgery report recommending a "Child Safety consult" and a skeletal survey.  (Doc. 28, ¶ 41).  Around 10:30 p.m., Defendant Kathryn Crowell, M.D., interviewed Plaintiffs as part of a Child Safety Team consultation, and subsequently issued a report that also recommended a skeletal survey.  (Doc. 28, ¶¶ 43-44).  On December 3, Defendant Joel Weinstein, M.D., observed retinal hemorrhages and retinoschisis in L.S.'s eyes, which he reported were "highly suggestive of repetitive shaking injury and would be extremely rare in any other setting."  (Doc. 28, ¶ 51).  A

3

skeletal survey was performed on L.S., but no evidence of fractures were found.  (Doc. 28,¶ 59).  An MRI performed on L.S. revealed a bilateral subdural hematoma.  (Doc. 28, ¶ 60).  Defendant Andi Taroli, M.D., Director of the PSHMC Child Safety Team, was also consulted.  She reported that L.S.'s injuries were consistent with shaking, but that Plaintiffs had denied shaking the baby.  (Doc. 28, ¶¶ 63-64).  Defendant Taroli ruled out birth as the cause of L.S.'s subdural hemorrhage, but did not review L.S.'s birth records prior to rendering her opinion.  (Doc. 28, ¶¶ 157, 168).

On December 6, 2011, Defendant Mark Dias, M.D., surgically drained L.S.'s subdural fluids.  (Doc. 28, ¶ 71).  On December 9, Defendants Garber, Redcay, and Boyer again threatened to place L.S. in foster care if Plaintiffs would not agree to a "Placement Safety Plan."  (Doc. 28, ¶¶ 72-73).  That plan provided that Plaintiffs would have two hours of supervised contact with L.S. per day, but prohibited them from having ongoing contact with her.  (Doc. 28, ¶ 72).

On December 11, 2011, L.S. presented with new areas of subdural bleeding and a depressed fontanel, which, Plaintiffs allege, confirmed that her injuries were chronic in nature and not the result of shaking.  (Doc. 28, ¶ 76).  On December 13, 2011, L.S. was discharged from the hospital.  (Doc. 28, ¶ 78).  However, Plaintiffs were not permitted to take her home because the safety plan was still in place.  (Doc. 28, ¶ 81).

Plaintiffs allege that within 30 to 60 days of December 2, 2011, Defendants Garber, Redcay, Boyer, Hasselback, Murray, Huegel, Taroli, Crowell, Weinstein, and

4

Dias participated in a  Child Safety Team meeting concerning the abuse allegations against Plaintiffs.  (Doc. 28, ¶ 84).  On March 5, 2012, Plaintiffs were notified in writing that Defendants Garber and Redcay filed an administrative report listing them as perpetrators of abuse.  (Doc. 28, ¶ 85).  The notice contained information about how Plaintiffs could obtain administrative review of the report and request its expungement. (Doc. 28, ¶ 86).  On March 21, 2012, Plaintiffs requested a hearing.  (Doc. 28, ¶ 87).

Meanwhile, the safety plan was extended on April 19, 2012, because Plaintiffs had not completed a required parenting program.  (Doc. 28, ¶ 88).  On July 12, 2012, L.S. was permitted to return home, subject to scheduled and unscheduled visits by Lancaster County CYS employees.  (Doc. 28, ¶ 94).  The safety plan was lifted entirely on September 12, 2012.  (Doc. 28, ¶ 95).  Five months later, on January 14, 2013, the Pennsylvania Department of Public Welfare conducted a hearing to determine whether the report against Plaintiffs should be expunged.  (Doc. 28, ¶ 110).  After finding that a reasonable person would not have concluded that L.S.'s injuries were the result of abuse, the report was expunged.  (Doc. 28, ¶¶ 113-116).

III.        Discussion

A.  Standard of Review

Rule 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted."  Under Rule 12(b)(6), we must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be

entitled to relief."   Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (quoting

Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008)).   While a complaint

need only contain "a short and plain statement of the claim," FED. R. CIV. P. 8(a)(2), and

detailed factual allegations are not required, Bell Atlantic Corp. v. Twombly, 550 U.S.

544, 555, 127 S.Ct. 1955, 1964, 167 L.Ed.2d. 929 (2007), a complaint must plead

"enough facts to state a claim to relief that is plausible on its face."   Id. at 570.   "The

plausibility standard is not akin to a 'probability requirement,' but it asks for more than a

sheer possibility that a defendant has acted unlawfully."   Ashcroft v. Iqbal, 556 U.S. 662,

129 S.Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 556).   "[L]abels and

conclusions" are not enough, and a court is not "'bound to accept as true a legal

conclusion couched as a factual allegation.'"   Twombly, 550 U.S. at 555 (quoted case

omitted).

In resolving a motion to dismiss, we thus "conduct a two-part analysis."

Fowler, supra, 578 F.3d at 210.   First, we separate the factual elements from the legal

elements and disregard the legal conclusions.   Id. at 210-11.   Second, we "determine

whether the facts alleged in the complaint are sufficient to show that the plaintiff has a

'plausible claim for relief.'"   Id. at  211 (quoted case omitted).

*B. Substantive Due Process Claim*

It is widely recognized that parents have a constitutionally protected liberty

interest in the care, custody, and direction of their children.   See Lehr v. Robertson, 463

U.S. 248, 253 (1983).   However, that right "does not include a right to remain free from

6

child abuse investigations." Croft v. Westmoreland Cnty. Children & Youth Serv., 103 F.3d 1123, 1125 (3d Cir. 1997).  This is because the "liberty interest in familial integrity is limited by the compelling governmental interest in the protection of children–particularly where the children need to be protected from their own parents." Id.  In order to state a claim for violation of their substantive due process rights, Plaintiffs must demonstrate that Defendants lacked an objectively reasonable suspicion of abuse. Id. at 1126; see also Livingston v. Allegheny Cnty., 400 F. App'x 659, 664 (3d Cir. 2010).  "[T]he government action must 'exceed both negligence and deliberate indifference, and reach a level of gross negligence or arbitrariness that indeed shocks the conscience.'" Billups v. Penn State Milton S. Hershey Med. Ctr., 910 F. Supp. 2d 745, 758 (M.D. Pa. 2012) (Kane, J) (internal quotation omitted).  Moreover, removal of a child from the custody of his or her parents "does not infringe on parental rights, 'even if evidence produced during the course of an investigation demonstrates that no abuse occurred.'" Id. at 759 (citing Croft, 103 F.3d at 1126).

    In this case, Defendants objectively and reasonably suspected that L.S. had been abused.  L.S. exhibited physical signs of abuse, including subdural hematomas, retinal hemorrhages, a bulging anterior fontanel, loss of appetite, and lethargy, among others.  Plaintiffs contend that Defendants violated their constitutional rights by failing to rule out other causes of L.S.'s symptoms prior to diagnosing her with shaken baby syndrome.  This argument was specifically rejected by the court in Billups v. Penn State Milton S. Hershey Medical Center, 910 F. Supp. 2d 745, 758 (M.D. Pa. 2012)

(Kane, J).  As the Billups court observed, this argument invites the court "to conclude that parents sufficiently state a substantive due process claim where they allege that medical professionals, upon conducting examinations of their child's injuries, rendered an opinion that the child had been abused but were not absolutely certain of that opinion's accuracy."  Billups, 910 F. Supp. 2d at 759.  Relying on this rationale, the court dismissed all but one of the plaintiff's substantive due process claims.  The court did allow one claim to proceed based on the allegation that one of the medical defendants had falsely testified that she considered alternative causes of the child's injuries before concluding that the child had been abused.  The Billups court reasoned that this misrepresentation amounted to a conscious disregard of the possibility that the child had not been abused.  Id. at 760.  In an attempt to bring the instant case within the scope of this reasoning, Plaintiffs argue that Dr. Taroli "claimed to have ruled out birth trauma without ever having obtained and reviewed L.S.'s birth records."  (Doc. 32 at 9). However, the amended complaint does not allege that Dr. Taroli claimed to have conducted screening to rule out birth trauma as the cause of L.S.'s injuries.  In fact, Plaintiffs' chief complaint regarding Dr. Taroli is that she outright failed to review L.S.'s birth records.  As discussed above, a medical professional's uncertain diagnosis of abuse is not a sufficient basis for a substantive due process claim.  Accordingly, we will dismiss this claim with prejudice.

### C.  First Amendment Claim

Defendants move to dismiss Plaintiffs' First Amendment claim, arguing that Plaintiffs have again failed to allege any supporting facts. We agree.  Although the Amended Complaint continues to cite the First Amendment (Doc. 28, ¶ 1), Plaintiffs make no allegations that support this claim.  We will dismiss this claim with prejudice.

### D.  Section 1981 Claim

Similarly, Plaintiffs continue to invoke 42 U.S.C. § 1981 as a basis for their claims but fail to plead any facts relating to race or alienage.  This claim will also be dismissed with prejudice.

### E.  Previously Dismissed Claims

In their amended complaint, Plaintiffs have repleaded all of the claims that were dismissed with prejudice pursuant to our June 12, 2014 order.  (See Doc. 25; Doc. 28 ¶ 190).  To the extent that Plaintiffs included these claims in their amended complaint to avoid waiving them for appeal purposes, that was unnecessary.[2]  We will grant Defendants' request to strike these claims.

---

2.  Plaintiffs did not have to replead their claims to preserve them for appellate review after we dismissed them as futile.  United States ex rel. Atkinson v. Pa. Shipbuilding Co., 473 F.3d 506, 516 (3d Cir. 2007) ("We believe the proper rule allows plaintiffs to appeal dismissals despite amended pleadings that omit the dismissed claim provided repleading the particular cause of action would have been futile.")(emphasis in original)(footnote omitted).

*III.*        *Conclusion*

For the reasons above, the motion to dismiss will be granted.  An appropriate order follows.

<u>/s/William W. Caldwell</u>
William W. Caldwell
United States District Judge